UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ANGELO VELEZ, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:22-cv-01624-SEB-TAB |
| | ) |
| JACK HENDRIX, et al., | ) |
| | ) |
| Defendants. | ) |

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Now before the Court are the Motions for Summary Judgment filed by Defendants G. Ciecil, S. Finch, and J. French [Dkt. 55] and Defendants Richard Brown and Jack Hendrix [Dkt. 59]. Plaintiff Angelo Velez, Jr., an Indiana Department of Correction ("IDOC") prisoner proceeding *pro se*, brings this civil rights action against Defendants Ciecil, Finch, and French, all employees of Geo Group, Inc, a private corporation that manages correctional facilities for IDOC (the "Geo Group Defendants"), and Defendants Brown and Hendrix, both IDOC employees (the "State Defendants"), alleging that Defendants have violated his Fourteenth Amendment Due Process rights by wrongfully holding him in segregation without due process. For the reasons detailed below, we GRANT both summary judgment motions.

**Factual Background**

On June 11, 2021, IDOC's Central Office transferred Mr. Velez from general population at the Wabash Valley Correctional Facility to the New Castle Correctional Facility—Transition Unit ("New Castle"). IDOC's Supervisor of Classification (who is

not named as a defendant in this action) approved Mr. Velez's transfer so that Mr. Velez could participate in the STAND program, an IDOC-authorized GEO Group program intended to provide necessary tools and education to assist inmates in addressing conduct or behavior issues. VanDervort Aff. ¶¶ 4–6.

At all times relevant to this litigation, Defendant Hendrix was employed by the IDOC as the Executive Director of Classification, Defendant Brown was employed by the IDOC as the Executive Director for Adult Facilities, Defendant Ciecil was employed by the GEO Group as New Castle's Classification Supervisor, Defendant French was employed by the GEO Group as New Castle's Assistant Facility Administrator, and Defendant Finch was employed by the GEO Group as New Castle's Assistant Facility Manager.

**New Castle's Transition Unit**

At New Castle, Mr. Velez was housed in the Transition Unit, which facility operates, at least in part, to assist offenders who have issues adjusting to open population housing units or have received conduct reports in general population housing units but have not received restrictive housing sanctions. In such cases, offenders may be transferred to the Transition Unit to assist them in adjusting to living in an open population housing unit. The Transition Unit permits offender movement similar to other general population units but limits an offender's contact with the open population to allow offenders to better adjust to two-man cells, eating with other offenders, and sharing recreation time. Brown Aff. ¶¶ 8–10. The process for transfer of an offender to the Transition Unit begins with a request from the correctional facility. The facility's request

2

proceeds through that facility's classification department and is then sent to the IDOC Central Office classification department for review and a final determination before a transfer can be effectuated. *Id.* ¶ 11.

The Transition Unit is divided into four pods: O1, O2, O3, and O4. Thibeault Aff. ¶ 4. Pods O1, O2, and O4 operate as general population housing units. *Id.* ¶ 11. In these pods, offenders are housed in two-man cells with a cellmate and are given a recreation period every day during which they are allowed to leave their cells without restraints to access the day room and an outdoor recreation area. *Id.* ¶¶ 12–13. During their recreation time, all offenders in the tier are allowed out of their cells together and are allowed to freely access the showers. *Id.* ¶¶ 13, 15. Offenders in these pods receive their meals in their cells but are permitted to take any food items or commissary with them to the day room to eat with other offenders during their recreation time if they choose to do so. *Id.* ¶ 14. Offenders in Pods O1, O2, and O4 can obtain employment and are allowed out of their cells to complete their job duties. *Id.* ¶ 18. They are permitted virtual visits, the use of the telephone and mail system, access to religious services through the facility chaplain, access to commissary in a manner comparable to other general population housing units, and permission to leave their cells for medical appointments and visits with a counselor. *Id.* ¶¶ 16–17, 19, 21–22.

Pod O3 in the Transition Unit operates as a restrictive housing unit and houses offenders in single-man cells. Thibeault Aff. ¶ 5. Offenders in Pod O3 receive one or two hours of recreation time per day, depending on their status, which time is spent in "single-man cages." *Id.* ¶ 7. Offenders housed in Pod O3 are allowed visits via the kiosk

located in the day room of the Pod and are placed in restraints when outside their cell. *Id.* ¶¶ 9.

**The STAND Program**

While housed in the Transition Unit, offenders may be offered an opportunity to participate in New Castle's STAND program, which is modeled after programming promulgated by the National Institute of Corrections ("NIC"). IDOC staff members are sent to training offered through the NIC and those staff members, in turn, train other IDOC staff members associated with the STAND program. Hendrix Aff. ¶¶ 15–16.

The STAND program is designed to assist offenders with the development of pro-social skills and cognitive training to help with daily decision-making. It aims to provide offenders with the cognitive skills and training to avoid and/or manage conflict to reduce negative conduct and disciplinary issues during their incarceration. *Id.* ¶ 17. While offenders may be recommended for participation in the STAND program, it is voluntary; no offender is required to participate. *Id.* ¶ 19. There is also no requirement that an offender participate in the STAND program as a prerequisite to eligibility for transfer out of the Transition Unit nor does the successful completion of the program by itself automatically ensure an offender's transfer to another facility. *Id.* ¶¶ 20–21. The offender's conduct and adjustment factor into the facility's recommendation that an offender be transferred out of the Transition Unit. *Id.* ¶ 21.

**Plaintiff's Transfer to the Transition Unit**

Prior to Mr. Velez's transfer to the Transition Unit, he had accrued from 2018 through June 2021, approximately eighteen conduct reports while housed in other

facilities, including a conduct report in May 2021 for intoxicants and a June 3, 2021 conduct report for fighting. Hendrix Aff. ¶¶ 24–25. Upon his arrival at New Castle on June 11, 2021, Mr. Velez was placed in the Transition Unit's O3 Pod where he remained through June 23, 2021, pursuant to a COVID quarantine. VanDervort Aff. ¶ 6; Dkt. 60-4 at 3. None of the named Defendants had any involvement in Mr. Velez's initial placement in the Transition Unit. VanDervort Aff. ¶ 7; Hendrix Aff. ¶ 31; Brown Aff. ¶ 12. While housed in the Transition Unit and participating in the STAND program, Mr. Velez was expected to refrain from earning any major conduct violations. VanDervort Aff. ¶ 7.

On June 23, 2021, Mr. Velez was transferred into Pod O1 within the Transition Unit to begin participating in the STAND program. Between June 23, 2021 and September 1, 2022, Mr. Velez was continuously housed in Pod O1 or O2. Dkt. 60-4 at 3–4.

While housed in the Transition Unit, Mr. Velez received multiple citations for his misconduct, including some major misconduct reports. Due to these violations, on September 1, 2022, Mr. Velez was assigned to a restrictive housing unit pending review at the scheduled disciplinary hearings. His hearings resulted in him being found guilty of three major misconduct incidents, making him a Transition Unit failure and requiring him to remain in restrictive housing until December 13, 2022. Hendrix Aff. ¶¶ 28–29; Dkt. 60-4 at 6. During this period in restrictive housing, Mr. Velez received weekly classification reviews—thirteen in total. Dkt. 60-5 at 4-16.

On September 27, 2022, Defendant Brown received a letter from Defendant French that outlined Mr. Velez's disciplinary history, including new major conduct

5

incidents during his time in the Transition Unit. The letter noted that, because of these incidents, Mr. Velez had been confined to restrictive housing status pending the outcome of his disciplinary hearings. The letter also stated that, following his disciplinary hearings, Mr. Velez had been found guilty of three major misconduct reports and had been designated a Transition Unit failure. Dkt. 57-7 at 43. According to Defendant Brown, although he received this letter, because it addressed classification issues for which he was not responsible he likely would have deferred to the classification department to address the issues raised therein. Brown Aff. ¶ 13.

On December 13, 2022, Mr. Velez was transferred to Pod O4 in the Transition Unit, where he remained until January 3, 2023. Dkt. 60-4 at 6. From January 3, 2023 through April 11, 2023, Mr. Velez was housed in Pod O3 of the Transition Unit. *Id.* at 6–7. While housed in Pod O3, Mr. Velez received nine classification reviews, an Offender Evaluation and Performance Report, and an Idle Status Review. Dkt. 60-7 at 17–27. On April 11, 2023, Mr. Velez was transferred from the Transition Unit at New Castle back to the Wabash Valley Correctional Facility. Dkt. 60-4 at 7.

**Defendants' Involvement in Transfer Decisions**

Within the IDOC, there are approximately 1,400 to 1,700 inter-facility transfers of offenders each month. Due to the high number of such transfers, absent special circumstances, a team of classification analysts handles most inter-facility transfers. Hendrix Aff. ¶ 4. Thus, Defendant Hendrix, as the IDOC's Executive Director of Classification, generally is not personally involved with classification activities done at the facility level, including weekly or monthly reviews, transfers in and out of the

Transition Unit, or other intra-facility transfers, including the transfers of which Mr. Velez complains. *Id.* ¶¶ 5–6, 9, 31.

Defendant Brown's duties as the IDOC's Executive Director of Adult Facilities include supervising the wardens of the adult facilities and acting as a liaison between the wardens and the IDOC Central Office. Brown Aff. ¶ 3. Defendant Brown was not personally involved with offender classification within the facilities, including offender reviews. *Id.* ¶¶ 4–5. Outside of transfers involving offenders coming out of long-term restrictive housing, Defendant Brown was also not involved in the review or approval process of offenders being transferred in or out of the Transition Unit. *Id.* ¶ 12.

None of the named GEO Group Defendants had responsibility for or control over the timing of facility transfers. In September 2022, Defendant French recommended Mr. Velez's transfer out of the Transition Unit back to the Wabash Valley Correctional Facility, but once that recommendation was made, the GEO Group Defendants had no role in determining whether the transfer would be approved by the IDOC Central Office or the timing of that transfer, once it was approved. VanDervort Aff. ¶¶ 15–16.

**The Instant Litigation**

Mr. Velez, proceeding *pro se*, filed his complaint on August 15, 2022. The Court screened his complaint pursuant to 28 U.S.C. § 1915A, and permitted his Fourteenth Amendment due process claims against the State Defendants Hendrix and Brown and the GEO Group Defendants Ciecil, French, and Finch to proceed. The GEO Group Defendants and the State Defendants filed separate motions for summary judgment on June 26, 2024. Mr. Velez requested and was granted an extension of time to file his

responses to these motions. That deadline has now passed with no response filed to either motion. Accordingly, the Defendants' respective motions for summary judgment are considered fully briefed.

## Legal Analysis

### I.  Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

Our Local Rules instruct the non-moving party to respond to a summary judgment motion by identifying determinative and disputed facts that create a triable issue. S.D. Ind. Local Rule 56-1(b). Though Mr. Velez requested (and was granted) an extension of time to file his responses to the pending summary judgment motions, the deadline has now passed, and he has filed no response. In the absence of a nonmovant's responsive brief, "the facts as claimed and supported by admissible evidence by the movant are admitted without controversy[.]" *Id.* 56-1(f)(1). In other words, when, as here, the non-moving party fails to respond, he effectively concedes the moving party's version of the

facts. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission."). Though we still construe the facts in the light most favorable to the non-moving party, a party's nonresponse "limit[s] the scope of facts a court may take into account in determining whether a genuine issue of material fact exists[.]" *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997).

## II.     Discussion

In support of their motions for summary judgment, Defendants argue that Mr. Velez's relatively short periods of time in restrictive housing, even considered cumulatively, are not sufficiently substantial to implicate his Fourteenth Amendment due process rights. Assuming that Mr. Velez's due process rights are implicated by his time in restrictive housing, however, Defendants maintain that they are nonetheless entitled to summary judgment because they provided him meaningful reviews and/or were not involved in the transfer decisions of which he complains.

State prisoners have a liberty interest under the Fourteenth Amendment's Due Process Clause in avoiding indefinite or prolonged assignments to segregation units that impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) (quotation marks and citation omitted); *Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017); *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697–98 (7th Cir. 2009) ("a liberty interest *may* arise if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh.") (emphasis in original). Under Seventh

Circuit caselaw, six months in segregation, without more, does not implicate a protected liberty interest.  *See*, *e.g.*, *Hardaway v. Meyerhoff*, 734 F.3d 740, 744 (7th Cir. 2013) ("Since [the plaintiff's] confinement was six months and one day in total, the duration of segregation alone is insufficient to rise to the level of a Fourteenth Amendment violation.").  While "[t]here is no bright-line rule for the duration or conditions of segregation that might invoke a protected liberty interest, … generally a term of segregation approaching or exceeding a year may be considered significant enough to invoke due process protections." *Zuno v. Crow*, No. 24-cv-2345-DWD, 2025 WL 415964, at *3 (S.D. Ill. Feb. 6, 2025) (citing *Marion*, 559 F.3d at 698 (finding that a term of 240 days of segregation was long enough to mandate an inquiry into the conditions of the confinement)).

      Here, Mr. Velez spent a total of approximately seven months in restrictive housing while residing at New Castle, comprised of three separate time periods.  Upon his arrival at New Castle, he was in restrictive housing from June 11, 2021 to June 23, 2021 for a COVID quarantine.  Due to various conduct issues, Mr. Velez was returned to restrictive housing on September 1, 2022, while awaiting his disciplinary hearings.  Following the hearings, Mr. Velez was found guilty of three major conduct violations, after which having failed the STAND program, he remained in a restrictive setting through December 13, 2022.  Finally, Mr. Velez was returned to restrictive housing on January 3, 2023, where he remained until April 11, 2023, while he awaited a transfer from New Castle's Transition Unit to the Wabash Valley Correctional Facility.  During the time periods when he was in restrictive housing, Mr. Velez was housed in a one-man cell, permitted one hour

daily of recreation in a "one-man cage," and placed in restraints whenever he left his cell.[1]

If we were to assume that seven months spent in the above-described conditions was sufficiently harsh to have placed an "atypical and significant hardship" on Mr. Velez "in relation to ordinary incidents of prison life" sufficient to implicate his Fourteenth Amendment rights, Mr. Velez has nonetheless failed to show that his rights were violated by Defendants.  To comply with due process, prison officials must periodically conduct informal and non-adversarial reviews to ensure that administrative segregation does not become a pretext for indefinite confinement.  *Isby*, 856 F.3d at 525.  "The [periodic] review need not be extensive, ... [b]ut the review must be meaningful; it cannot be a sham or a pretext." *Id.* at 527 (quotation marks and citation omitted). In addition, reviews need not be made according to rigid timelines. "The periodic review need only be sufficiently frequent that administrative segregation does not become 'a pretext for indefinite confinement of an inmate[.]'" *Westefer v. Neal*, 682 F.3d 679, 686 (7th Cir. 2012) (quoting *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983)).

The undisputed evidence before us here establishes that while Mr. Velez was placed in restrictive housing, he received regular reviews.  From September 1, 2022 through December 13, 2022, he received a total of thirteen weekly classification reviews. Dkt. 60-5 at 4–16.  From January 3, 2023 through April 11, 2023, Mr. Velez received nine classification reviews, an Offender Evaluation Performance Report, and an Idle Status

---

[1] In his complaint, Mr. Velez makes additional allegations regarding the harshness of the conditions in restrictive housing but has proffered no evidence of such.

Review. *Id.* at 17–27.  These reviews indicated that Mr. Velez was placed in restrictive housing in September 2022 only after accumulating several conduct violations that led to him being determined a STAND Program failure.  Within a few weeks of Mr. Velez's transfer to restrictive housing, Defendant French notified the IDOC of Mr. Velez's major conduct violations and his failure to adjust at New Castle and recommended that he be returned to the Wabash Valley Correctional Facility.  Mr. Velez's transfer was approved by the IDOC Central Office on September 28, 2022, and the reviews of his restrictive housing status after that point reflect that he was awaiting pickup and transfer by the IDOC back to Wabash Valley, which ultimately occurred on April 11, 2023.  There is nothing on the face of these reviews to indicate that they were in any way arbitrary or pretextual so as to be constitutionally deficient, and Mr. Velez has provided no argument nor designated any evidence to establish otherwise.  Because Mr. Velez has failed to adduce any evidence that Defendants denied him meaningful review of his placement in restrictive housing, they are entitled to summary judgment on this claim.

To the extent that Mr. Velez maintains that he was wrongly kept in restrictive housing, that claim also fails.  "[I]ndividual liability under § 1983 … requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017 (internal quotation omitted) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault.  An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation. …

A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.") (emphasis removed)).

The undisputed evidence establishes that the GEO Group Defendants recommended Mr. Velez's transfer within a few weeks of his placement in restrictive housing in September 2022, and thereafter they had no further authority over whether the transfer was approved, or once approved, the specific timing. The undisputed evidence also establishes that the IDOC Central Office approved Mr. Velez's transfer on September 28, 2022. Although he was not transferred until April 11, 2023, Mr. Velez has designated no evidence that establishes that either of the named IDOC Defendants was responsible for the timing of the transfer or the decision to keep him in restrictive housing until the transfer occurred. Because there is no evidence that any of the named defendants was personally responsible for the decision to keep Mr. Velez in restrictive housing beyond the date that his release was recommended or approved, they are entitled to summary judgment on the claim that Mr. Velez was wrongly kept in a restrictive setting.

### III.   Conclusion

For the reasons discussed above, we <u>GRANT</u> the Motions for Summary Judgment filed by Defendants G. Ciecil, S. Finch, and J. French [Dkt. 55] and Defendants Richard Brown and Jack Hendrix [Dkt. 59]. Final judgment shall enter accordingly.

IT IS SO ORDERED.

Date: _____2/18/2025_____

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

ANGELO VELEZ, JR.
220728
WABASH VALLEY - CF
Wabash Valley Correctional Facility
6908 S. Old US Hwy 41
CARLISLE, IN 47838

Carlton Wayne Anker
Lewis and Wilkins LLP
anker@lewisandwilkins.com

Joseph Thomas Lipps
BBFCS ATTORNEYS
jlipps@bbfcslaw.com

Elijah B. Mollet
Lewis And Wilkins LLP
emollet@lewisandwilkins.com

Eric Ryan Shouse
Lewis And Wilkins LLP
shouse@lewisandwilkins.com